IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

FILED

OCT 1 2 2016

U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

|  |  |  |
|---|---|---|
| | ) | No. 1:16-cv-02453-RLY-DML |
| ALERDING CASTOR HEWITT, LLP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | Magistrate Judge Debra McVicker Lynch |
| v. | ) | |
| | ) | |
| CAROLE WOCKNER and | ) | |
| PAUL FLETCHER | ) | |
| Defendants. | ) | |

## COUNTER COMPLAINT

Paul Fletcher and Carole Wockner, Defendants, bring this counter complaint

against the law firm of Alerding Castor Hewitt, LLP, and allege as follows:

## THE PARTIES

1. Defendant Paul Fletcher (hereinafter "Fletcher") is an individual who is a

citizen of California.

2. Defendant Carole Wockner (hereinafter "Wockner") is an individual who is a

citizen of California.

3. Plaintiff Alerding Castor Hewitt LLP (herein after "HWE") is a law firm with

its principal place of business located in Indiana.

## STATEMENT OF JURISDICTION AND VENUE

4. Jurisdiction is based on 28 USC § 1332, diversity of citizenship.

5. Defendant Paul Fletcher is a citizen of and domiciled in California.

6. Defendant Carole Wockner is a citizen of and domiciled in California.

7. Alerding Castor Hewitt, LLP is a limited liability partnership formed under the laws of Indiana with its principal place of business located at 47 S. Pennsylvania Street, Suite 700, Indianapolis, Indiana 46204 (hereinafter "ACH"). Each and every partner of ACH whether an equity or non-equity partner is a citizen of and domiciled in Indiana.

8. The plaintiffs have joint and several liability to defendants for the damage suffered by defendants.

9. The amount in controversy exceeds $75,000 exclusive of interest and costs.

10. Defendants will seek to consolidate venue to the Northern District of Indiana where a related legal malpractice matter is pending. Venue is currently in this district Southern District of Indiana, pursuant to 28 USC Sec. 1331 (b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in this district.

## BACKGROUND FACTS

11. Fletcher and Scott Taylor (hereinafter "Taylor") were life-long close personal friends. Taylor died on September 23, 2008 in Arkansas.

12. Taylor resided in Crown Point, Indiana. Taylor had never married and he had no children.

13. Beginning in high school, Taylor and Fletcher developed and shared a common passion for acquiring, repairing, and restoring vintage European sports cars. Taylor was a top-notch mechanic for rare European vintage race cars and was quite successful.

14. Taylor was diagnosed with cancer in or about 2001.

15. Taylor held financial investment accounts at Fidelity Brokerage

Services, LLC (hereinafter "Fidelity") and on information and belief based on documents produced by Fidelity and conversations which Taylor had with Fletcher and others before he passed, Taylor had other investments held in certificates of deposit or otherwise which in combination totaled about $1 million dollars.

16.    In 1998, Taylor designated Fletcher as the sole beneficiary for all financial investment accounts he held at Fidelity.

17.    On April 12, 2007, as Taylor's health began to decline due to terminal cancer, Taylor told Fletcher that Fletcher was the beneficiary of his investment accounts and told him the values of his investments were approaching $1,000,000 in value. Taylor told Fletcher that Fletcher need not be concerned about Taylor's parents because he had taken care of his parents by purchasing their home for them and because he was leaving the funds in his banking account to his parents via a will he had prepared. Taylor further told Fletcher that was he did not want the funds he was leaving Fletcher to go through a probate estate because he thought the funds would go mostly to attorneys and the government and he wanted to be sure his intended beneficiary got the funds and so he made Fletcher his beneficiary on all his investment/retirement accounts.

18.    Prior to his death, Taylor also represented to several other friends including a friend named Donald Johnson that the value of his investments was just under $1,000,000 and that Fletcher was his sole beneficiary.

19.    Defendant Golomb is a retired attorney and was a former client of Taylor. Over the years Taylor had restored vintage Ferraris for Golomb and had been paid in excess of $100,000 by Golomb. Taylor mentioned to close friends in 2008 that Golomb had complained to him about how much he had paid Taylor over the years for

the work Taylor had performed for him.

20. Prior to his death, Taylor entrusted Golomb to manage some of his financial accounts including those at Fidelity as well as other investments which Taylor had told Fletcher would belong to Fletcher when Taylor died.

21. On information and belief, based on Fidelity documents and conversations which Taylor had with Fletcher and other friends before his death, Golomb had control over Taylor's accounts at Fidelity and approximately $500,000 in maturing certificates of deposits belonging to Taylor. According to Taylor, Golomb had "full" and/or "trading" authority on Taylor's investment accounts at Fidelity.

22. On or around July 25, 2008, Taylor's physical condition deteriorated and he was transported to his parent's home in Arkansas for hospice care where he died on September 23, 2008.

23. The events that transpired between July 25, 2008 and September 23, 2008 were the subject of litigation by Fletcher against Fidelity and Mark Zupan (hereinafter "Zupan") for forgery in Crown Point, Lake County, Indiana, Case No. 45D11-0902-PL00024 captioned *Paul Fletcher v. National Financial Services d/b/a Fidelity Investments and Mark Zupan.*

24. Mark Zupan was also a friend of Taylor's and resided in North Carolina.

25. Immediately after Taylor was transported to Arkansas, Zupan, who lived in North Carolina, went to Taylor's home in Crown Point, Indiana, and falsely represented to the home's caretaker that he was the executor of Taylor's estate. Zupan was not the executor of Taylor's estate; Taylor's mother and father were the executors

of his estate.

26.     Fletcher believes that Zupan wanted access to Taylor's home in Crown Point, Indiana after Taylor left for Arkansas because it was common knowledge that Taylor kept large sums of cash at his home and Zupan wanted access to the home to see if he could locate any assets or cash there.

27.     Zupan contacted Fletcher seeking to locate the title to one of his vintage Jaguars, a 1954 XK140 coupe, which Taylor had given Fletcher. Zupan also contacted Fletcher again after Taylor's death about the title the Jaguar. Fletcher did not provide the title to Zupan because Taylor had given Fletcher the title and told him the car belonged to Fletcher. Fletcher later learned that Zupan sold the vehicle without his permission.

28.     According to the caretaker, Zupan removed Taylor's personal papers, a 1954 Jaguar XK120 roadster, valued at about $100,000, and a 1956 Jaguar XK140 coupe, and took them to his residence in North Carolina.

29.     On or about August 1, 2008, Zupan also placed several calls to Golomb and to the Fidelity office in Oak Brook, Illinois where Taylor's Fidelity accounts were managed. At about the time of the final call placed by Zupan, the Fidelity phone call log summarized call content as account holder Taylor requesting that the beneficiary of all of his accounts be changed by drafting a new beneficiary form consisting of four pages of beneficiary change information "pre-filled" by Fidelity employee Kim Rice through a question and answer session over the phone with the requester, who Fletcher believes to have been Zupan, not account holder Taylor. Taylor's Arkansas phone number was not listed among the incoming calls to Fidelity that day. Fletcher alleged in

the Zupan litigation that he believed that through the calls to Golomb and Fidelity, Zupan and Golomb induced or in collaboration with Fidelity forged the creation of a change of beneficiary form that was not actually requested by nor known by Taylor.

30.     At or about the same time the alleged beneficiary change was requested, Golomb requested additional authority regarding one of Taylor's accounts at Fidelity and John Burkhardt of Fidelity was sending documents to Taylor for his signature to allow Golomb additional authority over the Fidelity account.

31.     Telephone records were obtained in discovery in the underlying litigation which showed that for the period July 2 through August 8, 2008, Taylor never called Fidelity.

32.     On August 1, 2008, the day Fidelity claimed Taylor called to request a change of beneficiary, the phone records show only a call from Fidelity to Taylor which lasted only about one minute.

33.     After Taylor's death on September 23, 2008, Fletcher was notified that a change of beneficiary form had been executed on August 2, 2008, and that Mark Zupan was now the beneficiary on Taylor's Fidelity accounts.

34.     The change of beneficiary form allegedly executed by Taylor changed the beneficiary from Fletcher to Mark Zupan for two accounts totaling approximately $300,000, but due to an error by Fidelity, Fletcher remained beneficiary of one account worth about $37,000.

35.     Fletcher notified Fidelity that he believed the change of beneficiary was obtained under fraudulent circumstances. On or about February 5, 2009, Fidelity wrote to Fletcher denying any fraudulent activity.

36.    Immediately after discovering the alleged change of beneficiary, in November of 2008, Fletcher and his wife, Wockner, called Golomb. Fletcher and Wockner asked Golomb who was Taylor's beneficiary and Golomb affirmed to both Fletcher and Wockner that he understood Fletcher was to be Taylor's beneficiary.

37.    Fletcher and Wockner also questioned Golomb as to whether he had communicated with Zupan at or near the time the beneficiary change was made and Golomb denied any communications with Zupan. Fletcher later learned that Golomb had not been truthful to him and that he was in communication with Zupan on multiple occasions at or about the time the beneficiary change was made. At this time, Fletcher had not discovered the nature of those communications but believes that Zupan and Golomb were communicating about the investments which were to go to Fletcher.

38.    On or around February of 2009, Fletcher filed a complaint against *National Financial Services d/b/a Fidelity Investments and Zupan* in Crown Point, Lake County, Indiana, Case No. 45D11-0902-PL 00024, alleging forgery.

39.    In early June 2009, Fletcher entered into a written agreement with attorney Nathan S. J. Williams (herein after referred to as "Williams") of Shambaugh, Kast, Beck & Williams, LLP (herein after referred to as "Shambaugh") wherein Williams agreed to represent Fletcher in recovering all money Taylor intended Fletcher to inherit in return for a contingency fee on any amount recovered.

40.    Even though Fletcher had expressly told Williams he did not want to dismiss Fidelity until a determination could be made if Fidelity was involved in the improper beneficiary charge, Williams dismissed Fidelity as a party to action.

41.    Without notifying Fletcher, and without Fletcher's consent, Williams

surrendered Fletcher's one inherited account to Fidelity pursuant to an interpleader filed by Fidelity. Fletcher specifically told Williams that he would not agree to tender the value of his inherited Fidelity account for any reason. Despite this, Williams entered into this agreement on or around January 10, 2010, but failed to disclose this to Fletcher until on or around July 25, 2011.

42.      Williams did not seek to have the contested amounts in the two other accounts held by Zupan to be interpled to protect Fletcher's interest.

43.      Fletcher specifically told Williams that Golomb had access to and was managing Taylor's financial accounts, which Fletcher later learned included but was not limited to, the funds at Fidelity as well as $500,000 in maturing certificate of deposits. Fletcher also told Williams that based on what Taylor told him before his death, he was the beneficiary of those accounts. Taylor told Fletcher that the funds were not going to go through his probate estate and that Fletcher had been named the beneficiary of the accounts.

44.      Williams sent Golomb two letters seeking information about the accounts he was holding but when those letters went unanswered; Williams took no further action to determine what funds Golomb was holding or how the funds were held.

45.      Williams repeatedly emailed Fletcher that he was going to depose Golomb but never did.

46.      When Zupan's attorney arranged for the out of state depositions of a Fidelity employee and Taylor's mother, Williams elected not to attend the depositions personally but assured Fletcher the deposition could be handled effectively over the

phone.

47.  Well in advance of the out of state depositions, Fletcher prepared and sent Williams favorable admissions made by key witnesses including but not limited to Taylor's mother which would have supported Fletcher's position in the litigation. During the deposition, Williams failed to elicit the favorable admissions which Fletcher had informed Williams were made prior to the deposition.

48.  Williams failed to communicate with Fletcher for months at a time. Williams failed to advise Fletcher when discovery was received and would withhold the discovery from Fletcher for extended periods of time.

49.  Fletcher repeatedly requested that discovery be undertaken because he came to realize in a case like the one against Zupan the details and timing of events was critical to establish evidence to refute Zupan's claim and support his claims. Williams also failed to investigate the relationship between Zupan and Golomb and why Golomb had denied talking to Zupan at or about the time of the beneficiary change when phone records showed that multiple conversations took place.

50.  Williams also failed to amend the complaint to include other recoverable claims including undue influence and tortious interference with expectancy and Zupan's taking of the Jaguar that Taylor had given to Fletcher before his death, despite having the necessary facts to give rise to a cause of action. Williams also failed to develop the evidence necessary to support the causes of action.

51.  Between November 2009 and June 2011, Fletcher made at least six written requests to Williams to pursue incoming and outgoing phone records of Taylor's mother's residence, but Williams took no action.

52.     Fletcher also repeatedly asked Williams to obtain phone records from AT&T and Fidelity but Williams never obtained the phone records which Fletcher was requesting.

53.     On or around June 3, 2011, Fletcher's case was dismissed under Indiana Trial Rule 41(E) when Williams failed to prosecute the case for 60 days. Williams failed to notify Fletcher of this until on or around July 25, 2011.

54.     On or around July 25, 2011, Williams terminated his relationship with Fletcher in writing stating, "…I have done a poor and unprofessional job of keeping you advised as to the status of matters in this case. I offer no excuse for that, as none would be appropriate."

## FLETCHER'S PENDING LEGAL MALPRACTICE ACTION AGAINST HOEPPNER WAGNER & EVANS LLP

1-54.   Paragraphs 1-54 above are hereby incorporated as though fully set forth herein as paragraphs 1-54 of Count I, Fletcher's Pending Legal Malpractice Action against Hoeppner Wagner & Evans.

55.     Upon discovery of Williams' mishandling of his case, Fletcher sought new counsel. Fletcher contacted attorney Douglas K. Walker ("Walker") of HWE because he promoted himself on the HWE website as a Certified Public Accountant and Fletcher wanted Walker to aggressively pursue all the missing money. Fletcher told Walker to "follow the money."

56.     On or around August 2011, Fletcher entered into a written agreement with HWE wherein HWE agreed to represent Fletcher in recovering all money Taylor intended Fletcher to inherit on an hourly basis. At all relevant times, Walker was acting as the actual agent of HWE.

57.     Instead of handling the case himself, Walker immediately assigned a young and inexperienced attorney named Michael L. Meyer to work on Fletcher's case. At all relevant times, Meyer was acting as the actual agent of HWE.

58.     At no time did Walker, Meyer, or anyone else at HWE advise Fletcher that Fletcher had a legal malpractice claim against Shambaugh or that there was a two year time limit from the time the relationship with Shambaugh terminated to bring a legal malpractice lawsuit.

59.     In October of 2011, HWE was able to vacate the dismissal of the case. Immediately upon the case being reinstated, Fletcher and Meyer/Walker communicated about the discovery which had been done and the discovery which needed to be done including obtaining the phone records which Shambaugh had failed to obtain, medical records of Taylor, exemplars of Taylor's signature, documents from Golomb, and retaining a handwriting expert and obtain an opinion regarding Taylor's signature on the change of beneficiary form.

60.     By mid-February 2012, Fletcher was becoming frustrated because he felt that HWE was not engaging in necessary discovery in a timely manner, nor following up with discovery requests responsive to deposition testimony and produced documents. In order to move the case along, Fletcher drove from California to Arkansas to attempt to obtain a HIPAA release from Taylor's mother so that Taylor's signature exemplars could be obtained from his Arkansas medical records but were unsuccessful because Taylor's mother was reluctant to sign the all-inclusive HIPAA form HWE had provided which far exceeded the scope of information sought.    Had the attorneys at HWE explained the HIPAA form to Mrs. Taylor and reduced the language

on the release form to solely the need for a signature of Taylor's from his Arkansas medical records she likely would have signed the document.

61. On or about February 21, 2012, Fletcher again wrote to HWE requesting discovery on over a dozen matters including the phone records.

62. Meyers assured Fletcher he would get the discovery requests out quickly and made subsequent assurances to Fletcher that led Fletcher to believe the discovery was in progress.

63. Fletcher again contacted HWE in March of 2012 to check on the status of discovery. Walker responded with a letter recommending a settlement or, in the alternative, that the very discovery which Fletcher had previously requested in October of 2011 and February of 2012 be pursued. Fletcher expressed concern to HWE that the critical, contemporaneous handwriting exemplars had not been obtained and the expert disclosure date was approaching and asked HWE to get an extension of the time for expert disclosure. Those exemplars were an important part of the cause of action for forgery but HWE did not get the exemplars.

64. HWE failed to meet several court ordered discovery deadlines.

65. Even when expressly asked by Fletcher to amend the complaint, HWE failed to amend the complaint to include other claims including undue influence and tortious interference with expectancy despite having the necessary facts or the ability to obtain the necessary facts to state a cause of action.

66. HWE also failed to bring a claim against Golomb or otherwise make an investigation into the funds Golomb managed despite being told by Fletcher that Taylor had said Fletcher was the beneficiary of the funds and being told Golomb had

acknowledged that Fletcher was Taylor's beneficiary in conversations with Fletcher and his wife Wockner.

67.     HWE also failed to investigate the relationship between Zupan and Golomb and why Golomb had denied talking to Zupan at or about the time of the beneficiary change when phone records showed that multiple conversations took place.

68.     HWE failed to depose Golomb or otherwise investigate the missing $500,000 in certificate of deposits held by Golomb.

69.     When Zupan, the key defendant in the litigation was deposed, Walker did not prepare for or take the deposition but instead sent the inexperienced Meyer to take his first deposition. Meyer had not adequately prepared for the deposition and thus, failed to challenge statements made by Zupan and failed to question Zupan about facts and information which refuted his deposition testimony. Meyer failed to follow up on statements made by Zupan or to challenge the statements made by Zupan at the deposition which would have shown he was not being truthful and would have established that Zupan was intent on taking whatever he could from Taylor's estate without disclosure to the estate of those assets, including the 1956 Jaguar XK140 coupe that Taylor had given Fletcher when he gave Fletcher the title.

70.     About mid-April 2012, shortly before the close of expert witness discovery, Fidelity finally produced some phone records. Fletcher believes the delay on the part of Fidelity was intentional, but because HWE did not press the issue, Fidelity placed Fletcher in a compromised position because the document was produced so late in discovery. Instead of providing records from its phone carrier provider, Fidelity produced what appeared to be a spread sheet which appeared to be a summary

created by Fidelity.

71.     When Fletcher received and reviewed the telephone spread sheet Fidelity provided, Fletcher noticed that the record for the very phone call which would help corroborate Fidelity's claim that it called Taylor on the day of the alleged beneficiary change request had an obvious anomaly. Fletcher contacted Meyer the day of receipt and raised the anomaly to Meyer who did nothing with the information. Fletcher then conducted further investigation on his own and had the document reviewed by a software engineer with Adobe International Headquarters in San Jose, California. The software engineer analyzed both pixelated and vector-based images contained in the spread sheet and found that the pixilated entry related to the key phone call was "very likely" cut and pasted into the vector-based document. When Fletcher informed Meyer of this development, he again failed to act on the information which could have been used to discredit Zupan's key witness, Fidelity, and may also have established impropriety on the part of Fidelity. Meyer instead told Fletcher that 'you could not prove a forgery case with circumstantial evidence.'

72.     Fletcher continued to push HWE to obtain the information and evidence which Fletcher had discussed with HWE early in its representation and to otherwise prepare the case for trial.

73.     By June 2012, in frustration, Fletcher withheld payment of fees from HWE in an effort to get HWE's attention and to make sure that the discovery he wanted done would be undertaken and completed. Walker of HWE wrote to Fletcher and told Fletcher he had to pay up or HWE would quit his case. Fletcher continued to attempt to negotiate with HWE to reach a resolution with HWE regarding its representation of

him, to confer with associates at HWE that had estate litigation experience, to file a motion for extension of discovery deadlines, to aggressively pursue discovery, and to further prepare for trial up to and through July 6, 2012, when HWE was granted leave from the court to withdraw as Fletcher's counsel.

74.      Almost immediately after HWE withdrew, a new Judge was assigned in the state court case and she closed discovery citing the years which Fletcher had to undertake discovery. Thereafter, Zupan filed a motion for summary judgment.

75.      Fletcher had a difficult time finding new counsel to take the case given the posture of the case and the failure to secure and develop key evidence which was available to support Fletcher's claim.

76.      When Fletcher was eventually able to retain new counsel, Alerding Castor Hewitt, LLP, ("ACH") Plaintiff in the subject action, Fletcher was forced to pay ACH a significant sum to come up to speed in a short time because a summary judgment response was being required by the court.

77.      As a result of the failure of HWE to develop the evidence which would have refuted Zupan claim and strengthened Fletcher's case, Zupan was granted summary judgment in May 2013.

78.      Fletcher appealed the decision granting summary judgment and the appellate court reversed and remanded the case to the trial court.

79.      Zupan appealed this decision to the Indiana Supreme Court where the decision of the appellate court was affirmed.

80.      After HWE withdrew from Fletcher's case, ACH attempted to re-open discovery so that Fletcher would have the evidence he needed for summary judgment

and for trial but the trial court refused to allow Fletcher any further discovery.

81.    HWE and its attorneys owed Fletcher a duty to possess and apply the knowledge and use the skill and care ordinarily used by reasonably well-qualified attorneys practicing under the circumstances for which they were retained.

82.    HWE breached their duty of care and failed to adhere to the standard of care of reasonably well-qualified attorneys and were negligent in one or more of the following ways:

a.  Failed to depose Golomb;

b.  Failed to initiate discovery to determine what funds Golomb was holding and how the funds were held;

c.  Failed to advise plaintiff of the cause of action for legal malpractice against Shambaugh and that there was a time limit of two years for bringing such claim;

d.  Failed to timely conduct discovery and obtain evidence which was available which supported Fletcher's position and refuted defenses asserted by Zupan;

e.  Failed to obtain handwriting exemplars of Scott Taylor executed at the time Taylor first arrived in Arkansas;

f.  Failed to obtain a report from the handwriting expert;

g.  Failed to have the phone records of Fidelity verified by carrier AT&T;

h.  Failed to retain an expert to analyze the phone records of Fidelity;

i.  Failed to depose available and key witnesses and failed to adequately prepare for and undertake the deposition of witnesses which were deposed;

j.  Failed to keep Plaintiff adequately advised about his case;

h.  Caused Fletcher to be barred from obtaining the evidence he needed and

sought to support his forgery claim by its dilatory conduct;

i.    Was unable to investigate the role Golomb had related to the change of beneficiary; and

j.    Was otherwise negligent in the handling of Fletcher's case.

83.    Fletcher has incurred damages as a result of the negligent acts and omissions of HWE set forth herein, including but not limited to: Fletcher was unable to marshal available evidence to support his forgery claim; was unable to identify and recover the funds held by Golomb believed to be approximately $500,000, incurred attorney fees and costs of approximately $200,000 related to successor attorneys taking over case, the summary judgment motion and appeal; lost his legal malpractice claim against Shambaugh including losing the ability to recover attorney fees spent to reinstate the case; lost the ability to pursue Fidelity; was unable to develop and prosecute his tortious interference with expectancy and undue influence claim, and now will have to go to trial on the remaining forgery claim without important evidence including but not limited to handwriting analysis and phone record analysis.

84.    The negligent acts and omission of HWE set forth above were a direct and proximate cause of damages suffered by the Fletcher.

Fletcher filed a complaint against HWE for legal malpractice on July 7, 2014, in the Northern District of Indiana, praying that the Honorable Court enter a judgment in his favor and against Hoeppner, Wagner & Evens, LLP in an amount to be determined by the trier of fact, the same being in excess of $75,000 exclusive of interest and costs; that Fletcher recover his costs of that action; and that he be granted such other and further relief as the court deems to be appropriate.

## PENDING ACTION AGAINST WAYNE GOLOMB
## FOR CONSTRUCTIVE FRAUD

1-84.    Fletcher re-states and re-alleges paragraph 1-84 above as paragraphs 1-84 as though fully set forth herein.

85.    Golomb was entrusted with holding and managing investments accounts including accounts owned by Taylor at Fidelity and funds believed to be held in certificates of deposit totaling approximately $500,000 for the benefit of Taylor during his lifetime and then were to go to Fletcher, the intended beneficiary designated by Taylor upon Taylor's death.  Golomb knew Fletcher was the intended beneficiary of the accounts because shortly after Taylor's death Golomb acknowledged to Fletcher and his wife Wockner that he knew Fletcher was to be the beneficiary of Taylor's accounts.

86.    Shortly after Taylor's death when Fletcher and his Wockner contacted Golomb to tell him that they learned there had been a change of beneficiary shortly before Taylor's death on the Fidelity accounts, changing the beneficiary from Fletcher to Zupan, Golomb expressed surprise and stated that he understood Fletcher was to be the beneficiary of Taylor's investment accounts.

87.    On information and belief, Golomb knew all the accounts he was entrusted to hold and manage were to be held in a manner which would cause the accounts to go to Fletcher on Taylor's death without passing through his probate estate. This belief is based upon the fact that prior to his death Taylor told Fletcher that the accounts were being held in a manner to avoid probate and have the accounts go to him as Taylor's beneficiary upon Taylor's death and thus, Golomb as the holder and manager of the accounts would also have such knowledge.  Moreover, Golomb had access to Taylor's financial accounts at Fidelity and thus, knew Fletcher was Taylor's

named beneficiary.

88.     To the best of Fletcher's knowledge based on his lifelong relationship with Taylor and communications he had with Taylor, the funds which Golomb managed or controlled were earned in the federal judicial district of the Northern District of Indiana, the funds are believed to have remained in that judicial district unless removed by Golomb, that Golomb advised Taylor about the funds in that judicial district and the communications regarding the accounts took place with Taylor in that judicial district.

89.     Because of the negligence of his attorneys in failing to obtain records and depose Golomb and because Golomb is withholding any information about the investment accounts from Fletcher and because only Golomb knows where he placed the funds, Fletcher has been unable to corroborate with documentary evidence what he had been told by Taylor.

90.     As fiduciary for the funds entrusted to him by Taylor and for which Fletcher was the intended beneficiary, Golomb had a duty to communicate with Fletcher and turn the funds over to him in accord with Taylor's wishes. Although Golomb has acknowledged to Fletcher and his wife Wockner that Fletcher was the intended beneficiary of Taylor's accounts, Golomb failed to communicate with Fletcher, failed to turn over the funds to Fletcher or to explain why he has not turned over the funds to Fletcher.

91.     Fletcher relied on Golomb to hold and manage the funds in accord with the stated intent of Taylor and relied on Golomb to tender the funds to him upon Taylor's death in accord with how Taylor had said the accounts were to be held.

92.     After Taylor's death, Fletcher made demand upon Golomb for

information about the accounts, other than Fidelity accounts, which he was holding and for which Fletcher was told he was to be the beneficiary by Taylor and Golomb refused to provide Fletcher any information or any accounting.

93.    Fletcher made a second and third demand upon Golomb to account for the funds via his attorney Williams and those demands were ignored.

94.    Golomb is engaging in a course of conduct whereby he is gaining a unconscionable advantage over Fletcher due to the fact that Golomb is the sole person who has knowledge about the Taylor funds he is holding and for which Fletcher was told by Taylor he was the beneficiary. Golomb is refusing to either account for the funds, turn them over, or explain why he is not turning them over in accord with what Taylor stated was to happen to the funds upon his death, namely that Fletcher was to receive them in a beneficial capacity.

95.    Thus, Golomb is in breach of his fiduciary duty to Fletcher as intended beneficiary of the Taylor accounts to convey to Fletcher the funds in the investment account in accord with Taylor's wishes.

96.    As a direct and proximate result of Golomb's failure to communicate with Fletcher and/or turn over the funds for which Fletcher was the intended beneficiary, Fletcher has suffered damage in that he has been deprived of the funds which Taylor intended he receive.

97.    Golomb is being unjustly enriched by retaining the account to the detriment of Fletcher as he has no known ownership interest in the accounts but was only a holder and manager of the accounts which were intended by Taylor to go to Fletcher upon Taylor's death as his account beneficiary.

Fletcher alleges that Golomb has engaged in constructive fraud and seeks to have the court order him to immediately account for all funds he was holding and managing for Taylor and to tender the funds which he was holding and managing for Taylor to Fletcher. Fletcher asks for such other and further relief as may be just and equitable.

## PENDING ACTION BY FLETCHER AGAINST WAYNE GOLOMB
## CONSTRUCTIVE TRUST

1-97.    Fletcher re-states and re-alleges paragraph 1-97 above as paragraphs 1-97 as though fully set forth herein.

98.    Golomb is believed to have in his possession funds which he was holding and managing for Taylor which were intended to benefit Fletcher on Taylor's death and which Golomb had an actual or equitable duty not to keep but to convey to Fletcher in accord with Taylor's stated wishes. It was Taylor's stated wish that the accounts not be probated but that Fletcher be named as beneficiary on the accounts so that the accounts would go to Fletcher outside of probate.

99.    Golomb is being unjustly enriched by retaining the account to the detriment of Fletcher as he has no known ownership interest in the accounts but was only a holder and manager of the accounts which were intended by Taylor to go to Fletcher.

Fletcher has asked the Court to impose a constructive trust on the funds which Golomb was holding and managing for Taylor and order Golomb to tender all funds which he was holding and managing for Taylor to Fletcher. Fletcher has asked for such other and further relief as may be just and equitable.

## PENDING ACTION BY FLETCHER AGAINST WAYNE GOLOMB
## FOR ACCOUNTING AND TURNOVER

1-99.     Fletcher re-states and re-alleges paragraph 1-99 above as paragraphs 1-99 as though fully set forth herein.

100.     Golomb is holding funds which he was managing for Taylor and which were intended to be given to Fletcher upon Taylor's death and which information and belief Golomb had a duty to tender the funds to Fletcher, Taylor's beneficiary, upon Taylor's death.

101.     Golomb has not turned over the Taylor funds he is holding to Fletcher although he acknowledges that Fletcher was to be the beneficiary of the funds and has stonewalled Fletcher and failed and refused to provide any information relating to the funds which Taylor had told Fletcher he would receive upon his death despite at least two demands made on Golomb.

102.     Golomb is the sole person with knowledge about the funds including their current location and how the funds are held.  Golomb is in breach of his duty to turn over the funds to Fletcher in accord with the instructions of Taylor.

103.     Fletcher asks that Golomb account for the funds of Taylor's which he held and managed and turn over the funds to Fletcher who Taylor had designated and intended would be the beneficiary of the funds.

Fletcher has asked the Court to enter an order requiring Golomb to identify all funds which he holds, to provide the records related to the accounts for the five years preceding the death of Taylor, and to turn any and all funds to Fletcher which Taylor had further relief as may be just and told him he was to receive upon Taylor's death.  Fletcher has asked for such other and equitable.

## COUNTER COMPLAINT OF DEFENDANTS FLETCHER AND WOCKNER AGAINST ALERDING CASTOR HEWITT, LLP

1-103. Fletcher and Wockner re-state and re-allege paragraphs 1-103 above as paragraphs 1-103 as though fully set forth herein.

104. Upon contact with Alerding from ACH and introduction of Fletcher's case background by Wockner, Alerding touted his extensive courtroom litigation experience which was of paramount importance to Fletcher's case to be proven by circumstantial evidence. Wockner expressed Fletcher's steadfast commitment to take his case to trial. Wockner, a co-signor to the agreement and proprietor of all documents transmitted, stored, and created electronically, impressed the importance of having an aggressive astute, and well-experienced courtroom litigator onboard and immersed in all facets of Fletcher's case so that all relevant circumstantial evidence could be culled from the record and used to maximum extent and effect against impeachable Defendant Zupan, who committed forgery, as alleged in Fletcher's original complaint. Wockner also expressed the need for a *sole* experienced courtroom litigator, to acquire such complete and thorough command of the facts, because that *sole* courtroom litigator would have to draw from that knowledge repeatedly to lay out facts for proof of Zupan's forgery with Fletcher's circumstantial evidence and for impeachment purposes of defense witnesses during trial.

105. After extensive electronic transmission of case records from Wockner and numerous telephone conversations and between Alerding and Wockner, including one conversation in which Alerding stated that key witness Mrs. Taylor could be re-deposed, post-discovery, in Arkansas to serve as trial witness testimony in lieu of her

23

appearance at trial, Alerding agreed to represent Fletcher to meet Fletcher's and Wockner's objectives.

106.     Fletcher and Wockner entered into an agreement for Alerding of Alerding Castor Hewitt to represent Fletcher in his case which alleged forgery against Defendant Mark Zupan on about October 21, 2012. ACH was to take over the case from HWE after discovery was closed in August 2012 and a deadline for a Response to Defendant Zupan's Motion for Summary Judgment was approaching.

107.     Alerding told Wockner prior to preparing and sending an Engagement Letter that ACH could not take the case on contingency, and Alerding estimated that up to trial to allow for attorney fees of up to $100,000, with up to an additional $20,000 for putting on the trial, which at that time was anticipated to be a three day trial by jury. Alerding also demanded a $75,000 retainer.

108.  After engagement, Alerding never mentioned that Fletcher and Wockner should file a malpractice suit against our former attorneys, and never brought up anything about statute of limitations for same.

109.  ACH never advised Fletcher and Wockner that Fletcher's complaint was never amended to include undue influence and other causes of action yet pursued arguing those in their opposition to summary judgment and appeal.

110.     Soon after signing the agreement and paying a retainer of $50,000, negotiated down from $75,000, Alerding stepped into the background, assigning two associate attorneys, Kreider and Kirk, to prepare Fletcher's Opposition to Motion for Summary Judgment, for which Wockner had to devote a substantial amount of her time providing input, editing, and review. Fee estimates for specific tasks were grossly

exceeded. The estimated fee for the first appeal of summary judgment was $15,000—the actual invoiced amount was over $47,000.

111.     As the initial trial date of December 14, 2015 approached, both associate attorneys, Kreider and Kirk, who had worked exclusively on Fletcher's case, left ACH. Wockner then learned that Alerding may never have had more than a single trial before a jury, and neither had his associates, Kreider and Kirk, who were assigned to the case since October 2012. In fact, since February 2016, Wockner learned from Kirk, at that time subcontracted to help with the case as no one with knowledge therein remained at ACH, that Kirk had no jury trial experience and not much else besides a couple "minor collection cases."

112.     In the weeks leading up to the first scheduled trial date, December 14, 2015, and aware that both Kreider and Kirk left the firm, Wockner expressed concern 1) whether Alerding was involved in the case to the degree necessary to know the facts and evidence of the case since taking on the case in October 2012, and 2) any newly-assigned attorneys deemed necessary by Alerding to prepare for trial that would be replacing Kreider and/or Kirk, would not be charging their learning curve to Fletcher.

113.     By October 2015, Alerding's communications with Wockner were caustic and seemed more intent on bullying Wockner and Fletcher to end the case rather than bring it to trial. Alerding sought the opinion of Mr. Hewitt from ACH regarding case viability in early November 2015, but apparently not prior to engagement in October 2012. There was no change in Fletcher's case from the time Alerding agreed to take the case in October 2012: Fletcher's case remained the same as the original complaint, a forgery action to be proven with circumstantial evidence. The only

difference was that the pre-trial witness deposition of Mrs. Taylor that Alerding stated in October 2012 could be performed in Arkansas was never arranged by Alerding before her death last fall.

114. Alerding displayed unfamiliarity with the facts of Fletcher's case and their relevance. His attitude worsened with his failure to prepare a trial outline, sign Defendant's Pre-Trial Order nor timely prepare and file Plaintiff's Pre-Trial Order due in late January 2016. Days later, on February 4, 2016, he unleashed an outburst on the phone with Wockner, essentially trying to again abandon the case.

115. Wockner and Fletcher saw inefficiencies and duplicative charges on invoices for October and November 2015 for new attorneys to familiarize themselves with aspects of the case the departed attorneys should have already known. Wockner and Fletcher had already expressed this concern with Alerding in September and early October 2015, stating that 1) they would not pay to bring new hires up to speed, nor for their inefficiencies due to lack of experience, and 2) ACH fees should remain consistent with the original estimate of $20,000 for trial. Alerding stated that he would try to hold the fees down, but to expect that they could go over that estimate "a bit."

116. Wockner witnessed and complained that this "team" approach by staff attorneys was grossly inefficient, as no one demonstrated a command of the evidence or what to do with it, despite volumes of emails from Wockner over the years that spelled out the relevance and intended use of that evidence. Wockner expressed to Alerding that restoring lost knowledge from attrition of associate attorneys assigned to Fletcher's case should not become their financial burden. Alerding disagreed and justified such cost of new learning curves for new hires foisted on the client was just the normal

course of business.

117.    ACH failed to research the statute for forgery and did not cite proper case authority for forgery, which harmed the presentation and proof of Fletcher's case.

118.    ACH failed to discover that forgery was statutorily eligible for treble damages through the Crime Victims Relief Act and consequently did not timely plead for those damages.

119.    Before trial preparation had begun in late early 2016 for a rescheduled April 18, 2016 trial date, ACH had already billed and received payment from Wockner and Fletcher in excess of $147,000 since the start of their engagement at the summary judgment phase of the Fletcher's matter.

120.    On February 4, 2016, Alerding tried to "fire" Wockner and Fletcher as clients in one of his several outbursts, and refused to communicate with Wockner after that point. By then, it was clear that Alerding's unprofessional demeanor was jeopardizing Fletcher's chances of success. No new invoices were presented between late January and late March, so there were no invoices to "repeatedly" be late on, and the principal's attitude regarding how impossible it was to get evidence admitted, coupled with not recognizing its relevance, and inactions such as full participation in timely preparation of Pre-Trial Order during the months leading up to trial were harmful to the case. Further, no one on the team demonstrated such knowledge and recognized relevance of the facts for admission and use as proof. Wockner and Fletcher had warned in letters dated October 2, 2015 and February 12, 2016, that they would not agree to pay for duplicate charges for new attorneys. Additionally, as the trial date approached and Wockner saw how unprepared and disengaged the "team" was,

Wockner informed Kirk that she would be withholding future payments until she saw definite and worthy progress on work performed consistent with the original agreement and pre-engagement discussions with Wockner.

121.    Alerding failed to provide any questions for witness Golomb in his March 2016 deposition in Fletcher's combined Legal Malpractice action against his former attorneys at HWE and constructive fraud action against Golomb. Alerding also failed to respond when given opportunity to secure new discovery from Fletcher's Legal Malpractice action that would prove beneficial in Fletcher's case against Zupan. Alerding did not apprise Fletcher of nor pursue nor secure a renewed discovery opportunity for Fletcher because of the newly-opened discovery phase in Fletcher's Legal Malpractice case in the Northern District of Indiana.

122.    Alerding became unavailable for trial by entering substance abuse rehabilitation one week before trial, on or about April 10, 2016.

123.    While Alerding was in rehabilitation, ACH filed a motion to withdraw. Fletcher opposed the motion and the Court ordered ACH to continue representing Fletcher through trial.

124.    ACH assigned a newly-hired attorney, Anthony Roach, to Fletcher's case. Roach told Wockner that he had never brought a civil case before the court.

125.    ACH attorneys assigned to bring case to trial, Anthony Roach and Stefan Kirk, were not well versed in the facts for proof of Fletcher's case. Kirk also told Wockner that sometimes it took all day to find the answer to a procedural question that Wockner may ask of him, and even then he was not sure of the answer.

126.    During opening at trial, ACH presented rebuttable evidence of

Fletcher's opponent as proof of Fletcher's claim when it served only to undermine Fletcher's claim. ACH also failed to certify critical evidence for admission, failed to properly present the most critical evidence for Plaintiff, and failed to argue adequately to secure sufficient grounds to appeal decisions and rulings that harmed Plaintiff. As a consequence of ACH's negligence and breach of duty to perform as agreed, Plaintiff's three-day trial ended after just six hours with a directed verdict precipitated by ACH's material failure to present Fletcher's case.

127. An additional approximately $115,000 was billed to Wockner and Fletcher to prepare for and present their six-hour long trial which abruptly ended by directed verdict for Defendant Zupan

## COUNT 1 – BREACH OF CONTRACT

1-127. Fletcher and Wockner re-state and re-allege paragraphs 1-127 above as paragraphs 1-127 as though fully set forth herein.

128. As a result of ACH's 1) failure to execute their duties in accordance with their Engagement Letter and pre-engagement discussions with Defendant Wockner, 2) impairment of principal attorney Alerding while handling Fletcher's case, 3) resulting in the need to repeat trial preparation because Alerding was unavailable while in substance abuse rehabilitation, 4) the assigning of inexperienced attorneys with little to no civil trial experience to act as lead attorneys contrary to Alerding's assurances to Wockner that he would be the lead attorney and remain immersed in Fletcher's case, 5) the considerable effort and cost devoted by ACH to defend an undue influence and tortious interference claim against summary judgment when the complaint was only for forgery and never amended to include those causes of action, 6)

the failure to the loss by attrition of two associate attorneys originally assigned to Fletcher's case, and 7) ACH's common dispatch of two attorneys to appear on behalf of Fletcher at routine motion hearings in Lake County, Fletcher and Wockner have been charged excessively for a low caliber of work effort and engagement which has resulted in Fletcher's loss at trial.

129. As a direct result of ACH's inefficiencies, disengagement, and impairment, Wockner and Fletcher have suffered damages including the fees paid to date which plaintiffs are attempting to recover in this case which arose as a result of their negligent representation.

130. The breaches of the agreement by the plaintiff relieved the defendant of any further obligation to pay any sums under the agreement.

WHEREFORE, Defendants pray for a judgment against ACH in the amount paid by Wockner and Fletcher to date, to relieve Defendants of any outstanding fees allegedly owed ACH, the costs of this action, and for such further relief as may be appropriate.

## COUNT 2 – LEGAL MALPRACTICE

1-130. Fletcher and Wockner re-state and re-allege paragraphs 1-130 above as paragraphs 1-130 as though fully set forth herein.

131. Upon entering into the attorney/client relationship with Wockner and Fletcher, ACH was charged with a duty to exercise reasonable care and skill in representing Fletcher's interest in his case against Zupan.

132. ACH failed to research the appropriate statute for Fletcher's sole cause of action, failed to file a Pre-Trial order, failed to secure evidence for presentation at trial,

failed to properly introduce most critical evidence during trial, failed to argue to secure adverse rulings for appeal during trial, failed to produce a trial outline, failed to know the facts proof of Fletcher's case, and used inexperienced attorneys to present Fletcher's case.

133.  ACH breached its duty to exercise reasonable care and skill in Fletcher's matter with respect to trial preparation and execution and acted negligently, and as a direct result Fletcher was damaged.

134.  As a result of the negligent acts and omissions of ACH, Fletcher suffered damages including but not limited to the value of Scott Taylor's retirement accounts that were lost to Defendant Zupan totaling about $340,000, plus statutory treble damages for forgery, attorney fees, and costs

**WHEREFORE,** Defendants pray for a judgment against ACH for Fletcher's loss of his inherited retirement accounts totaling about $340,000, plus and statutory treble damages, attorney fees as allowed through the Crime Victim's Relief Act, and all costs and further relief as may be appropriate.

### COUNT 3 – BREACH OF FIDUCIARY DUTY

1-134.  Fletcher and Wockner re-state and re-allege paragraphs 1-134 above as paragraphs 1-134 as though fully set forth herein.

135.  Upon entering into the attorney/client relationship with Wockner and Fletcher, ACH was charged with a fiduciary to defendants as a matter of law. A fiduciary is required by law to disclose all material facts to clients including competence to execute duties.  Alerding failed to disclose his impairment from

substance abuse that affected his performance and ability to exercise reasonable care and skill in representing Fletcher's interest in his case against Zupan.

136. Because of Alerding's impairment, Fletcher's case was all but abandoned by Alerding and he assigned inexperienced newly-hired attorneys to replace him once he was completely incapacitated while in substance abuse rehabilitation. W

137. On multiple occasions as the trial date neared, Alerding tried to fire Wockner and Fletcher as clients to rid himself of his obligation to them. Alerding refused to speak to Wockner after he missed filing of a Pre-Trial order on January 29, 2016.

138. Alerding relied on Wockner to bring his newly-hired replacements up to speed on the facts of proof for Fletcher's case, including preparation of a trial outline.

139. Alerding billed Wockner and Fletcher for the learning curve of all newly assigned attorneys that replaced the original ones lost through attrition or to rehabilitation at ACH.

140. As a direct result of Alerding and ACH's breach of fiduciary duty, Defendants Wockner and Fletcher suffered financial damage and Fletcher lost his claim at trial.

141. As a direct result of ACH's breach of fiduciary duty, Wockner and Fletcher have suffered damages including the fees paid to date which plaintiffs are attempting to recover in this case which arose as a result of their negligent representation.

142. The breach of fiduciary duty by the plaintiff relieved the defendant of any further obligation to pay any sums under the agreement.

WHEREFORE, Defendants pray for a judgment against ACH in the amount paid by Wockner and Fletcher to date, to relieve Defendants of any outstanding fees allegedly owed ACH, the costs of this action, and for such further relief as may be appropriate.

Dated: October 11, 2016

## **AFFIDAVIT**

The undersigned, being first duly sworn, on oath deposes and says, that the statements set forth in the above and foregoing pleading are true and correct, except as to matters therein stated to be on information and belief, and as to such matters, the undersigned certifies as aforementioned that (s)he verily believes the same to be true.

Paul Fletcher
1203 E Cota Street
Santa Barbara, California 93103
91303
(805) 962-3929

Carole Wockner
1203 E Cota Street
Santa Barbara, California

(805) 456-9585

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

|  |  |
|---|---|
| ) | No. 1:16-cv-02453-RLY-DML |
| ) | |
| ALERDING CASTOR HEWITT, LLP ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| v. ) | Magistrate Judge Debra McVicker Lynch |
| ) | |
| PAUL FLETCHER and ) | |
| CAROLE WOCKNER ) | |
| Defendants. ) | |

## PROOF OF SERVICE

The undersigned hereby certifies that a copy of the foregoing document, COUNTER COMPLAINT, has been served this ___ day of October by depositing a copy of the same in the United States mail, first class postage prepaid and properly addressed to the following:

Michael Alerding
Alerding Castor Hewitt, LLP
47 S. Pennsylvania Street, Suite 700
Indianapolis, IN 46204

By: Kathleen Krueger
5840 N. Kenton Avenue.
Chicago, IL 60646